IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2012-NMSC-009

Filing Date: March 22, 2012

Docket No. 32,776

RUDY SAIS,

      Appellant-Respondent,

v.

NEW MEXICO DEPARTMENT OF CORRECTIONS,

      Appellee-Petitioner.

ORIGINAL PROCEEDING ON CERTIORARI
John W. Pope, District Judge

New Mexico Corrections Department
James R.D. Brewster, General Counsel
Santa Fe, NM

for Petitioner

Melendres, Melendres & Harrigan, P.C.
A. Paul Melendres
Albuquerque, NM

for Respondent

OPINION

BOSSON, Justice.

**{1}** This Court has previously established the principle that when an employer disciplines two public employees, arrested or convicted of driving while intoxicated (DWI), in a significantly different manner yet based on substantially similar conduct, the employer owes a legal duty to explain that difference satisfactorily with evidence in the record. If not, the court will reverse the action taken as arbitrary and capricious. *See In re Termination of Kibbe*, 2000-NMSC-006, ¶¶ 14-19, 128 N.M. 629, 996 P.2d 419. The present case offers this Court an additional opportunity to apply and amplify the principles we articulated over

1

twelve years ago in *Kibbe*. In doing so, we conclude that the employer here, unlike *Kibbe*, did place substantial evidence in the record to justify the action taken and to explain any alleged differences in the treatment of other employees. Accordingly, we reverse the decision of the district court and uphold the State Personnel Board.

**BACKGROUND**

**{2}** In June 2005, the New Mexico Department of Corrections (DOC) adopted the Employee DWI Policy (the Policy). The Policy notes that "New Mexico continues to suffer from a relatively high rate of DWI and . . . [t]he Department incarcerates in its prisons and supervises on probation or parole, a large number of offenders who have been convicted of DWI." Accordingly, the Policy requires "[a]ll employees who are charged with, arrested for, adjudicated guilty, or convicted of the criminal offense DWI" to submit a written report regarding the incident to the employee's supervisor within three working days "of such occurrence."

**{3}** In addition, the Policy imposes certain minimum sanctions based on the number of offenses a particular employee incurred. According to the Policy, a first offense requires at least a five-day suspension, while a second offense requires dismissal. Notably, the term "offense" is not explicitly defined. The sanctions section of the Policy, however, makes clear that "[d]iscipline for DWI will not necessarily be dependent upon a criminal conviction, a finding of guilt, or any other final adjudication by a court," but also states that "the disposition of any criminal or administrative charges may be considered in determining the appropriate discipline."

**{4}** DOC hired Rudy Sais (Respondent) in April 2006 as a Correctional Officer I. Respondent reviewed the Policy and signed a DWI acknowledgment form, noting that he received a copy of the Policy and he understood its requirements.

**{5}** On November 8, 2006, Respondent was arrested on suspicion of aggravated DWI. Pursuant to the Policy, Respondent reported the arrest to his supervisor the next day. Respondent received a seven-day suspension as a result of the arrest. The criminal charges against Respondent were ultimately dismissed without an adjudication of guilt or innocence.

**{6}** On March 13, 2008, Respondent was again arrested on suspicion of DWI. Again, Respondent's arrest was reported to DOC and an investigation was conducted. After the investigation, Respondent was dismissed based on a second offense under the Policy. The criminal charges against Respondent were once again dismissed without a finding of guilt or innocence.

**{7}** Respondent appealed his termination to the State Personnel Board (the Personnel Board) and a hearing was held before an administrative law judge (ALJ). At the hearing, Respondent claimed that he was treated differently than other employees under the Policy. He submitted evidence that at least three other DOC employees had been arrested two or

2

more times for DWI but were still employed by DOC.

**{8}** DOC responded with explanatory evidence for each of the individuals still employed. Elona Cruz, Human Resource Bureau Chief for DOC, testified that DOC did not count DWI offenses that occurred prior to the date the Policy began. DOC still employed Officer Taracina Morgan, who Respondent claimed had two prior DWI arrests, because she had only one arrest after the Policy was put in place.

**{9}** Elona Cruz also testified that DOC had no record of any arrests for the second individual, Officer Armando Rel. Respondent attempted to put this fact in doubt. He admitted into evidence a printout from the "Case Lookup" on www.nmcourts.gov which showed that Officer Rel had been charged with a fourth and later, oddly enough, a third DWI *after* the Policy was adopted. But, it was not clear from this report if these charges were the result of separate arrests or when any prior arrests occurred. The third DWI was charged on the same date as a plea hearing, suggesting that it was the result of a plea agreement that reduced the original charge from a fourth DWI to a third. In addition, Mike Sanchez testified that he had heard rumors, before he became Captain of Investigations for DOC, of multiple DWI arrests for Officer Rel. Nevertheless, Captain Sanchez explained that he does not commence investigations under the Policy until an employee self-reports, and apparently Rel made no such reports. Warden Robert Ulibarri testified, however, that one investigation was commenced based on an anonymous letter and he believed police officers have notified DOC after an arrest of a DOC employee.

**{10}** The third individual, Raymond De La Cruz, testified that he had been arrested twice for DWI after the Policy was in effect, once in 2006 and again in 2007, but was still employed by DOC. Instead of being terminated, Officer De La Cruz received a five-day suspension for his second offense. In response, Elona Cruz testified that when Officer De La Cruz was arrested for the second time, the Policy was under review and as a result he was not terminated. No other evidence, such as meeting minutes or internal memoranda, was offered in support of the statement by Elona Cruz. Ultimately, after review, the Policy was not changed and was fully enforced after that time. According to Elona Cruz, six or seven DOC employees had been terminated as a result of a second offense under the Policy.

**{11}** In addition to this explanatory evidence, DOC also offered evidence of Respondent's arrests. Regarding Respondent's first arrest, DOC entered into evidence a letter from his supervisor, Warden Ulibarri, detailing the circumstances surrounding his arrest, including the results of a failed breath test and the discipline imposed. To prove the circumstances of the second arrest, the full report of Sanchez, who was charged with investigating the incident for DOC, was admitted into evidence. The Sanchez report contained the official police reports of the two state police officers who were present during Respondent's arrest and a criminal complaint that indicated Respondent had again failed two breath tests with a blood-alcohol content more than twice the legal limit. The parties stipulated that both of these state police officers would testify that Respondent was arrested for suspicion of DWI. None of this evidence was impeached nor was its admission contested.

3

**{12}** After the hearing, the ALJ submitted an extensive recommended decision to the Personnel Board that supported Respondent's termination. The recommended findings of fact included DOC's discussions concerning the Policy at the time of Officer De La Cruz's second arrest, and concluded that Officer "De La Cruz is the only [DOC] employee who has not been dismissed after a second DWI arrest; all other offending employees have been disciplined strictly by policy." The Personnel Board adopted the ALJ's proposed findings of fact and conclusions of law in their entirety and upheld Respondent's termination.

**{13}** Respondent then appealed to the district court. In his statement of appellate issues, Respondent continued to argue that he was treated differently from others under the Policy. He also argued, for the first time, that the Policy itself was contrary to law because NMSA 1978, Section 28-2-4(A) (1997)[1] requires that termination of public employees be based upon conviction of a crime, not a mere arrest. The district court reversed the Personnel Board, finding that "[t]he termination of [Respondent] was arbitrary, capricious and contrary to law" because "he was not treated in a similar fashion to several other officers in similar circumstances." In addition, the district court's order stated that "[t]he hearing officer was required to hear 'explanatory evidence' in accord with the holding in . . . *Kibbe*, [2000-NMSC-006, ¶ 19], and failed to comply with this requirement." The district court did not rule on Respondent's statutory argument regarding Section 28-2-4(A). The order required Respondent to be reinstated to his former position with back pay and benefits.

**{14}** DOC then petitioned for certiorari to the Court of Appeals, which denied the petition. We granted certiorari in order to address the important policy issues implicated when DWI and public employment intersect, especially in light of this Court's precedent on the same subject. *See Kibbe*, 2000-NMSC-006, ¶ 19. For the following reasons, we reverse.

## DISCUSSION

### Standard of Review

**{15}** "[W]e apply the same administrative standard of review as the district court sitting in its appellate capacity." *Archuleta v. Santa Fe Police Dep't ex rel. City of Santa Fe*, 2005-NMSC-006, ¶ 15, 137 N.M. 161, 108 P.3d 1019. Thus, we "review the [Personnel Board's] order to determine if it is arbitrary, capricious, or an abuse of discretion; not supported by substantial evidence in the record; or, otherwise not in accordance with law." *Id.* (internal quotation marks and citation omitted).

---

[1]NMSA 1978, §§ 28-2-1 to -6 (1974, as amended through 2010) is known as the Criminal Offender Employment Act. Its purpose is to remove barriers for criminal offenders or ex-convicts to employment "in a lawful trade, occupation or profession . . . to make rehabilitation feasible." Section 28-2-2. Section 28-2-4 governs when a public employee may have such employment revoked for criminal activity, and only discusses certain circumstances involving convictions, not arrests.

4

**{16}** Such a ruling "is arbitrary and capricious if it is unreasonable or without a rational basis, when viewed in light of the whole record." *Id.* ¶ 17 (internal quotation marks and citation omitted). Though we must perform a whole record review, "[w]e must be careful not to substitute our own judgment for that of the agency . . . ." *Id.* Rather, "we must consider all evidence bearing on the findings, favorable or unfavorable, to determine if there is substantial evidence to support the result." *Tom Growney Equip. Co. v. Jouett*, 2005-NMSC-015, ¶ 13, 137 N.M. 497, 113 P.3d 320 (internal quotation marks and citation omitted). "Where the testimony is conflicting, the issue on appeal is not whether there is evidence to support a contrary result, but rather whether the evidence supports the findings of the trier of fact." *Id.* (internal quotation marks and citation omitted).

**Disparate Treatment**

**{17}** A worker's termination may be arbitrary and capricious if one employee is treated differently compared with others who are similarly situated and no rational explanation is offered for the difference. *See Kibbe*, 2000-NMSC-006, ¶ 19. Respondent has argued throughout these proceedings, and persuaded the district court, that he was treated disparately and should be reinstated as a result.

**{18}** Both the district court and Respondent rely on this Court's previous opinion in *Kibbe* to support their position that Respondent was disparately treated. In *Kibbe*, a school teacher was arrested for driving under the influence and was then terminated from his employment. *Id.* ¶¶ 3-4. Nothing indicated that the school district had a policy regarding DWI arrests. *Id.* ¶¶ 2-10. Appearing as a witness for the school district, the school superintendent offered no evidence of any previous instances in which discipline had been imposed in a manner similar to Kibbe. To the contrary, the superintendent testified about another teacher in the same district who had pled guilty to DWI while she was employed by the district, not only as a teacher but also as a substitute bus driver. *Id.* ¶ 8. Unlike Kibbe, the prior teacher was not disciplined by the school board, *id.*, and the superintendent "testified that under no circumstances would he have recommended terminating the other . . . teacher for her behavior, even if it had occurred at the present time," *id.* ¶ 17. This Court concluded "that the drastic difference in the school board's treatment of Kibbe compared to another . . . teacher for substantially similar conduct with no explanatory evidence in the record renders Kibbe's termination arbitrary and capricious." *Id.* ¶ 19. *Kibbe* remains good law today, and we reaffirm its holding in this Opinion.

**{19}** Relying upon *Kibbe*, Respondent argues that the decision to terminate him was arbitrary and capricious because he was treated differently from Officers De La Cruz and Rel. According to Respondent, those officers had multiple DWI arrests while the Policy was in place, yet were not terminated. Respondent's claim of disparate treatment failed to persuade the Personnel Board, and we conclude that the evidentiary record supports the Personnel Board's decision.

**{20}** Most tellingly, Respondent's argument focused on Officers De La Cruz and Rel and

5

overlooked the fact that he was treated *in the same manner* as at least six other DOC employees who self-reported a second DWI arrest, all of whom were terminated. Rather than being treated differently from other employees, as was the situation in *Kibbe*, the record shows that Respondent was treated the same as all but one similarly-situated corrections officer. Based on this record, Respondent is the norm, not the exception, to the rule.

**{21}** If anything, Officer De La Cruz is the exception, not Respondent. It was Officer De La Cruz who was not terminated for a second DWI offense, while at least seven others including Respondent were terminated. As we stated in *Kibbe*, a "decision not to impose disciplinary action against an employee for certain conduct does not foreclose disciplinary action against a different employee in the future for similar conduct" as long as there is a "meaningful distinction" between the employees. *Kibbe*, 2000-NMSC-006, ¶ 17.

**{22}** Unlike the record in *Kibbe*, a review of this record shows a consistent pattern in the enforcement of the Policy. Generally, if a DOC employee gets arrested twice for DWI, that employee is terminated. Even if an exception had been made in Officer De La Cruz's case, one exception cannot preclude enforcement of the Policy against all others for the foreseeable future. *See Archuleta*, 2005-NMSC-006, ¶ 34 (A "'decision not to impose disciplinary action against an employee for certain conduct does not foreclose disciplinary action against a different employee in the future for similar conduct.'" (quoting *Kibbe*, 2000-NMSC-006, ¶ 17)). One exception cannot be allowed to swallow the rule.

**{23}** Far from a random exception, however, the record shows that DOC put forth a defensible, policy-based reason for allowing Officer De La Cruz to remain employed. The uncontroverted testimony of Elona Cruz established that, at the time of Officer De La Cruz's second DWI arrest, DOC was reviewing its policy to determine whether it was appropriate to terminate employees based on mere arrests and not convictions. Accordingly, it was within DOC's discretion to refrain from terminating an officer during a period when DOC was not yet convinced termination was appropriate. The fact that the Policy was not ultimately changed is of no consequence, for if it were, any review of a policy by any state agency would then require some change to be made to that policy. However, we stress that the defense against irregular applications of a policy on the basis that the policy is under review is limited in scope. For example, if an employee could show that an employer claimed that a policy was repeatedly "under review" to let certain employees keep their jobs despite policy violations while holding others accountable under the policy, that pattern would suggest an arbitrary application of the policy.

**{24}** Explanatory evidence is required under *Kibbe* to show a "meaningful distinction" between employees who are treated differently. 2000-NMSC-006, ¶¶ 17, 19. A whole record review shows that DOC offered such evidence. Contrary to the conclusion of the district court, the ALJ and the Personnel Board could have rationally concluded that Respondent's termination was appropriate based upon the record and that Officer De La Cruz's situation did not require a different result. When the district court concluded that Respondent "was not treated in a similar fashion to several other officers in similar

circumstances," the court was simply incorrect based upon the record before it.

**{25}**    In addition, we do not find Respondent's comparison of himself to Officer Morgan apt. These two employees were not similarly situated, as Officer Morgan has only been arrested once for DWI during the Policy period. Accordingly, we do not find this to be an appropriate comparison to determine disparate treatment. *See Archuleta*, 2005-NMSC-006, ¶ 24 (noting that differences may mean employees are not similarly situated).

**{26}**    Respondent's comparison to Officer Rel is equally misplaced. While court records show that Officer Rel may have had multiple DWI arrests during the period when the Policy was in effect, it is also uncontroverted that Officer Rel did not report those arrests to his superiors, and therefore those arrests do not appear in DOC's records. While Captain Sanchez admitted that he had heard rumors about Officer Rel's arrests, Respondent did not offer any evidence that this informal and perhaps unreliable notice sufficed to trigger an obligation to investigate. Because the evidence does not indicate that management had an obligation to investigate Officer Rel's alleged arrests, Respondent has failed to show that he and Officer Rel are similarly-situated employees. In theory, a failure to report, if proven, could itself justify discipline, but the present record does not allow us to speculate on other charges involving other employees.

**{27}**    We recognize the problems inherent in a policy that rewards those who disregard its requirements, while punishing those who comply. Such a policy can easily be abused which could lead to arbitrary enforcement. DOC should be mindful of that potential for abuse in carrying out its obligation to review personnel policy for all employees. In this case, however, the merits of the Policy itself, as opposed to its application, were not challenged either before the Personnel Board or the district court, and therefore we decline to pass judgment on that issue. In the end, DOC had no record of Officer Rel's arrests, and thus Rel was not similarly situated to Respondent for purposes of a *Kibbe* analysis. *See Archuleta*, 2005-NMSC-006, ¶ 24.

**NMSA 1978, § 28-2-4 (1997)**

**{28}**    Respondent argues that the Policy is unlawful based upon the New Mexico Criminal Offender Act, NMSA 1978, §§ 28-2-1 to -6 (1974, as amended through 1997). Respondent interprets that Act to limit when public employment can be terminated, based upon a criminal conviction and not a mere arrest. However, this argument was not made to the ALJ and a ruling was not invoked before the Personnel Board. As such, we decline to address it. *Selmeczki v. N.M. Dep't of Corr.*, 2006-NMCA-024, ¶ 23, 139 N.M. 122, 129 P.3d 158 (requiring a ruling from the ALJ "sitting as the trier of fact, or the Personnel Board as the ultimate decision maker," in order to preserve an issue for review on appeal).

**CONCLUSION**

**{29}**    Accordingly, we reverse the district court and affirm the ruling of the Personnel

Board.

**{30}    IT IS SO ORDERED.**

_____

**RICHARD C. BOSSON, Justice**

**WE CONCUR:**

_____

**CHARLES W. DANIELS, Chief Justice**

_____

**PETRA JIMENEZ MAES, Justice**

_____

**EDWARD L. CHÁVEZ, Justice**

**PATRICIO M. SERNA, Justice (specially concurring)**

**SERNA, Justice (specially concurring).**

**{31}** I concur in this opinion because it is legally correct based on the record and the arguments advanced by the parties. I write separately only to express my discomfort in that my conscience tells me the result is unjust. In this case we have an employee with several DWI's that was not terminated because he failed to "self report" his DWI's. The Respondent, on the other hand, along with several other employees, followed the "self reporting" rule and were terminated. It seems unfair to me. Martin Luther King, Jr. said: "Our lives begin to end the day we become silent about things that matter." Justice Potter Stewart stated: "Fairness is what justice really is."

**{32}** It is the duty and responsibility of a Judge to adhere to the rule of law and apply it free of any personal belief, and therefore, I specially concur. However, I cannot remain silent about something that matters and seems unfair to me.

_____

**PATRICIO M. SERNA, Justice**

**Topic Index for _Sais v. New Mexico Dep't of Corrections_, Docket No. 32,776**

**AL          Administrative Law and Procedure**
AL-AA       Administrative Appeal
AL-JR       Judicial Review
AL-SC       Scope of Review

AL-SR        Standard of Review

**EL**          **Employment Law**
EL-DA      Disciplinary Action
EL-EP      Employer's Policies
EL-TE      Termination of Employment

**GV**         **Government**
GV-PE      Public Employees